# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOANNE BAUER | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 3:07-cv-1375 (PCD) |
| | : | |
| CITY OF HARTFORD; | : | |
| OFFICER HIRAM OTERO, in his official | : | |
| and individual capacity; | : | |
| OFFICER STEVEN KNEELAND, | : | |
| in his official and individual capacity; | : | |
| OFFICER JOSE PEREZ, in his official and | : | |
| and individual capacity; | : | |
| SERGEANT LAWRENCE, in his official | : | |
| and individual capacity; and | : | |
| PATRICK J. HARTNETT, Chief of Police, | : | |
| in his official and individual capacity | : | |
| | : | |
| Defendants. | : | |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Joanne Bauer brings this action against the City of Hartford and five

individuals–three police officers, a police sergeant and the Chief of Police–in both their

individual and official capacities.  Plaintiff alleges that the defendant sergeant and police officers

falsely arrested her and inflicted excessive force upon her in violation of 42 U.S.C. § 1983, the

Fourth Amendment, and Article I, §§ 7, 9 of the Constitution of Connecticut.  The complaint also

alleges against the sergeant and three police officers state law causes of action for reckless and

negligent conduct, assault and battery, negligent infliction of emotional distress, intentional

infliction of emotional distress, false imprisonment, and malicious prosecution.  As against the

Chief of Police and the City of Hartford, Plaintiff alleges that they instituted policies, practices

and customs exhibiting deliberate indifference to the constitutional rights of citizens, which were

a direct and proximate cause of the sergeant and police officers' unconstitutional conduct, in violation of 42 U.S.C. § 1983 and Article I §§ 7, 9 of the Constitution of Connecticut.  In addition, Plaintiff asserts that the City of Hartford is liable for the unconstitutional conduct of the sergeant and police officers under indemnity and respondeat superior theories of liability.

On March 16, 2010, Defendants filed motions for summary judgment [Doc Nos. 71, 73]. On June 7, 2010, Plaintiff moved for summary judgment as well [Doc. No. 80].  On June 7, 2010, Defendants moved to strike Plaintiff's summary judgment motion on the grounds that the motion was filed nearly three months after the March 19, 2010 deadline for dispositive motions [Doc. No. 82].  For the reasons stated herein, Defendants' motions for summary judgment are **granted in part and denied in part**, Defendants' motion to strike is **granted**, and Plaintiff's motion for summary judgment is **denied**.

## I.     BACKGROUND

Plaintiff has owned and resided at 25 North Beacon Street ("Beacon Street residence"),  a Victorian home consisting of three floors and 4,000 square feet of living space, since 1993. (Defendant Officers' Local Rule 56(a)(1) Stmt, hereinafter "Officer Defs.' Local Rule 56(a)(1) Stmt." ¶¶ 1-2.)[1]  She has rented out apartments and rooms in the Beacon Street residence since she began living there.  (Id. ¶ 4.)  In 2005, Plaintiff agreed to rent an apartment to Michelle Mathis ("Mathis") for the months of June and July of 2005, and the parties signed a lease to that effect.  (Id. ¶ 6.)  Mathis paid Plaintiff rent for the two months upon signing the lease, and she was given two keys to gain access to the Beacon Street residence.  (Id. ¶¶ 7-8.)

---

[1]     Facts taken from Defendants Officers' Local Rule 56(a)(1) Statement are uncontroverted unless otherwise indicated.

In the last week of July, Mathis asked Plaintiff if she could remain in the apartment past the date of her lease expiration because she had suffered an injury that impeded her ability to move out and find another place to live.  (Id. ¶ 9.)  Plaintiff responded that Mathis could not remain in that apartment but she could rent one of the rooms at the Beacon Street residence for $125 per week on a week-to-week basis.  (Id. ¶ 10.)  Although Plaintiff told Mathis that the rental was temporary because she intended to rent the room to a law student during the fall semester, she did not specify a date by which Mathis would need to move out.  (Id. ¶ 12; Pl.'s Local Rule 56(a)(1) Stmt. ¶ 10.)  Mathis moved her belongings into the new room and kept the two keys she already had as they allowed her to access the room.  (Officer Defs.' Local Rule 56(a)(1) Stmt. ¶ 13.)

Mathis never paid rent for three consecutive weeks in August.  (Pl.'s Local Rule 56(a)(2) Stmt. ¶ 6.)  On August 31st or September 1st, Mathis packed her belongings in bags and placed them in a common hallway.  She told Plaintiff that a rental for which she had paid a deposit had fallen through, so she was unable to move out that day.  (Id. ¶ 7.)

Soon after, Plaintiff decided that she wanted Mathis to move out.  On September 14, 2005, she left Mathis a voicemail message asking her to remove her possessions from the premises.  (Officer Defs.' Local Rule 56(a)(1) Stmt. ¶ 17.)  Mathis returned the call, asked Plaintiff not to remove her possessions, and indicated that she would remove the possessions herself that night, but never did so.  (Id. ¶ 18; Pl.'s Local Rule 56(a)(1) Stmt. ¶ 18)  On or about September 18, 2005, as she was driving home, Plaintiff saw Mathis walking in the neighborhood.  She stopped her car and informed Mathis that she needed to move out and return the keys, to which Mathis replied that she had talked to a policeman and "knew her rights."  (Officer Defs.'

Local Rule 56(a)(1) Stmt. ¶¶ 20-21.) The following afternoon, Plaintiff saw Mathis at the Beacon Street residence and reiterated that Mathis needed to leave, whereupon Mathis again responded that she was not leaving and "knew her rights." (Id. ¶¶ 23-24.) The following morning at approximately 2:30 am, Plaintiff ran into Mathis at the Beacon Street residence. After a brief conversation, Plaintiff went upstairs to go to bed. (Id. ¶¶ 26-27.) A few minutes later, the police arrived and informed Plaintiff that they had received a call indicating that she was following Mathis around the house with a flashlight. Plaintiff responded that Mathis did not belong at the Beacon Street residence because her lease had expired, she had stopped paying rent, and she had moved her belongings out of her room. (Pl.'s Local Rule 56(a)(2) Stmt. ¶ 19.) The officers replied that Plaintiff needed to evict Mathis. (Officer Defs.' Local Rule 56(a)(1) ¶¶ 30-31.) Although Plaintiff filled out a Notice to Quit form to begin the eviction process, she never gave it to Mathis or otherwise served it on her. (Id. ¶ 34.)

Over the next few days, Plaintiff did not see Mathis at the Beacon Street residence. (Pl.'s Local Rule 56(a)(2) Stmt. ¶ 20.) On September 23, 2005, she left Mathis a voicemail message indicating that her possessions were now on the front porch. (Officer Defs.' Local Rule 56(a)(1) ¶ 35.) On September 27, 2005 at approximately 7 p.m., Plaintiff saw Mathis on North Beacon Street speaking with Officer Otero ("Otero") on the sidewalk. (Id. ¶ 36.) Mathis informed Otero that she was a tenant at the Beacon Street residence and when she arrived home that evening, she discovered that her personal belongings had been placed on the porch. (Id. ¶ 37.) Otero saw Mathis' personal belongings on the front porch. (Id. ¶ 39.) Mathis also told Otero that her keys to the Beacon Street residence no longer worked. (Id. ¶ 38; Pl.'s Local Rule 56(a)(1) Stmt. ¶ 38). Otero asked her if she had any documents indicating that she lived at the Beacon Street

residence, and she replied no.  (Officer Defs.' Local Rule 56(a)(1) Stmt. ¶ 40.)

Otero then went to speak with Plaintiff, who was standing on the front porch, and told her that Mathis claimed that she lived there and had been locked out.  (Id. ¶¶ 41-42.)  Plaintiff informed Otero that Mathis no longer lived at the Beacon Street residence and was criminally trespassing, then had Otero speak with her attorney who was on the phone.  (Id. ¶ 43; Pl.'s Local Rule 56(a)(1) Stmt. ¶ 43.)  Otero reviewed the lease between Plaintiff and Mathis for the months of June and July, then asked Plaintiff if she had started the eviction process, to which she replied that she had a Notice of Eviction but it was not stamped by the court.  (Officer Defs.' Local Rule 56(a)(1) Stmt. ¶¶ 44-46.)  Otero then returned to Mathis and told her that he needed some documentation indicating that she resided at the Beacon Street residence, and she replied that she did not have any.  (Id. ¶ 49.)  Otero returned to Plaintiff and informed her that his partner had escorted Mathis away from the premises.  (Id. ¶ 50.)

About two hours later, Otero received a call from Sergeant Lawrence ("Lawrence"), who informed him that Mathis had shown him a phone bill indicating that she resided at the Beacon Street residence.  (Id. ¶ 51.)[2]  Otero met Mathis and reviewed her Sprint phone bill, which was from the current month and indicated that she did in fact reside at the Beacon Street residence. (Id. ¶ 52.)  One hour later, at approximately 11:00 pm, Otero returned to the Beacon Street residence with three other officers and Plaintiff came to the door.  Otero told Plaintiff that Mathis

---

[2]     Plaintiff denies that this conversation took place because, during his deposition, Lawrence did not recall meeting Mathis, reviewing her phone bill or speaking with Otero about the matter.  Moreover, the phone bill supposedly shown to Mathis was never produced in discovery as Defendants claim it was destroyed. (Pl.'s Local Rule 56(a)(1) Stmt. ¶ 51).  However, because Plaintiff was not present during the conversation between Lawrence and Otero, she cannot properly deny that the conversation took place or what was said.

had shown him proof that she resided there and that Plaintiff could not lock her out. (Id.¶¶ 53,

55.) Plaintiff responded that she would not allow Mathis back in the house. (Officer Defs.'

Local Rule 56(a)(1) Stmt. ¶ 54.) Otero claims that he explained that Plaintiff needed to proceed

with the eviction process and that she could not take matters into her own hands and kick Mathis

out. (Id. ¶ 55.) Plaintiff denies that he said this, and claims that he simply said Mathis belonged

in the house. (Pl.'s Local Rule 56(a)(1) Stmt. ¶ 55.) Otero also accused Plaintiff of changing the

locks to prevent Mathis from entering the house, which she denied. (Officer Defs.' Local Rule

56(a)(1) Stmt ¶ 56.) Otero and Plaintiff continued a back-and-forth about the locks, after which

Plaintiff said "I'll show you", then walked into her house and shut the door. (Id. ¶ 57.) Otero

called Lawrence and explained that he had tried to reason with Plaintiff but she had refused to

talk to him and shut the door. (Id. ¶ 60.)

     Otero and the other officers proceeded to knock loudly on Plaintiff's door in an attempt to

speak with her about the incident. (Id. ¶ 61.) According to Plaintiff, they banged on the door

and windows and threatened to arrest her and a visiting friend if one of them did not answer the

door. (Pl.'s Local Rule 56(a)(1) Stmt. ¶ 61.) The officers claim they could see Plaintiff pacing

back and forth inside the house, but she refused to answer the door. (Officer Defs.' Local Rule

56(a)(1) Stmt ¶ 62.)

     After about forty minutes, Plaintiff opened the door and allowed Officer Kneeland

("Kneeland") to enter to mediate the dispute. Plaintiff claims that she never "legally consented to

Kneeland's entrance" but rather agreed to allow him inside because the officers had "harassed

[her] and her friend for approximately 40 minutes." (Pl.'s Local Rule 56(a)(1) Stmt ¶ 64.)

After Kneeland entered, he accused Plaintiff of locking the door behind him and asked her to

unlock the door for his safety. (Officer Defs.' Local Rule 56(a)(1) Stmt ¶¶ 65-66.) Plaintiff

disputes that she locked the door behind him and claims that he opened the unlocked door

himself. (Pl.'s Local Rule 56(a)(1) Stmt. ¶ 66.) Otero then entered the house.

At this point, Otero claims that he tried to reason with Plaintiff once more. When she

again refused to allow Mathis back in the house, he informed her she was under arrest for

criminal lockout and interfering with the police. According to the officers, Plaintiff then began

flailing her arms. Otero told her she needed to calm down so that he could place the handcuffs

on her. After she calmed down, he handcuffed her. (Officer Defs.' Local Rule 56(a)(1) Stmt ¶¶

67-68.)

Plaintiff, on the other hand, claims that upon entering the house, Otero "immediately

grabbed [her] and handcuffed her without further conversation." (Pl.'s Local Rule 56(a)(1) Stmt.

¶ 67.) Otero grabbed her arms forcefully enough that she sustained black and blue bruises on her

arms. (Pl.'s Local Rule 56(a)(2) Stmt. ¶ 38.) After she was handcuffed, she was escorted to the

police cruiser for transport. She suffered two panic attacks while in police custody. (Id. ¶ 39.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is

therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986). A material fact is one which "might affect the outcome of the suit under the

governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." <u>Delaware & Hudson Railway Co. v. Consolidated Rail Corp.</u>, 902 F.2d 174, 178 (2d Cir. 1990).  "There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" <u>Id.</u> (internal citations omitted).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Parker v. Sony Pictures Entm't, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (quoting <u>Celotex</u>, 477 U.S. at 324); <u>see also</u> <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.")  If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e).

In determining whether the parties have met their respective burdens, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1061 (2d Cir. 1995).  However, "the non-moving party may not rely simply on conclusory allegations

-8-

or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also FED. R. CIV. P. 56(e). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

## III.    DISCUSSION

Plaintiff alleges three federal causes of action under 42 U.S.C. § 1983–false arrest, excessive and unreasonable force, and malicious prosecution–against the three police officers and sergeant (collectively "officers").  Additionally, Plaintiff alleges seven state law causes of action against the officers: unnecessary and unreasonable use of force under Article 1 §§ 7, 9 of the Connecticut Constitution, reckless and negligent conduct, assault and battery, negligent infliction of emotional distress, intentional infliction of emotional distress, false imprisonment, and malicious prosecution.  Against the Chief of Police and the City of Hartford, Plaintiff alleges policies, practices and customs exhibiting deliberate indifference to the constitutional rights of citizens in violation of 42 U.S.C. § 1983 and Article I §§ 7, 9 of the Connecticut Constitution. The complaint also asserts that the City of Hartford is liable for the officers' conduct under respondeat superior and indemnification theories of liability.

The parties have cross-moved for summary judgment.  Defendants have also moved to strike Plaintiff's motion for summary judgment because it was filed nearly three months after the March 19, 2010 deadline for dispositive motions.  Plaintiff never requested an extension of time to file her summary judgment motion and has not articulated a reason for the nearly three-month delay in filing her motion.  Therefore, the motion to strike is **granted** and Plaintiff's motion for

summary judgment is **denied** as untimely. Defendants move for summary judgment on each of Plaintiff's claims, and the Court addresses the merits of Defendants' motions below.

**A. Claims Against Officer Perez**

Defendants argue that Officer Perez should be dismissed from this action because he had no personal involvement in the incident culminating in Plaintiff's arrest. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting Moffit v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Officer Perez was not present during the incident, and therefore did not assist in or observe the arrest of Plaintiff. (Officer Defs.' Ex. F, Perez Dep. ¶¶ 6-13). Plaintiff does not dispute these allegations. Therefore, summary judgment is **granted** as to all of the claims against Perez.

**B. Claims Against Sergeant Lawrence, Officer Otero and Officer Kneeland**

**1. 42 U.S.C. § 1983 Claims**

Government officials are subject to suit in their individual capacities for violations of constitutional rights committed in the course of their employment. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). The challenged conduct must be "attributable at least in part to a person who was acting under color of state law" and "the conduct [must have] deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999).

In any § 1983 case on summary judgment, this Court must first determine whether,

-10-

"[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show

the [defendants'] conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201

(2001). If they do, this Court must consider whether qualified immunity shields individual

defendants from liability. Id.[3]

## A. Count One - False Arrest

In analyzing claims alleging the constitutional tort of false arrest, courts " generally look[]

to the law of the state in which the arrest occurred." Davis v. Rodriguez, 364 F.3d 424, 433 (2d

Cir. 2004). Under Connecticut law, a § 1983 false arrest claim requires the plaintiff to establish

that "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware

of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by

probable cause." Shattuck v. Town of Stratford, 233 F. Supp. 2d 301, 306-307 (D. Conn. 2002)

(quoting Arum v. Miller, 193 F. Supp. 2d 572, 585 (E.D.N.Y. 1985)). The existence of probable

cause for the arrest or imprisonment is a complete defense to a claim of false arrest under 42

U.S.C. § 1983. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Garcia v. Gasparri, 193 F.

Supp. 2d 445, 449 (D. Conn. 2002) ("[T]he existence of probable cause is a complete defense to a

civil rights claim alleging false arrest or malicious prosecution.").

Plaintiff argues that the officers did not have probable cause to arrest her for criminal

lockout and interfering with the police. The criminal lockout statute states in relevant part: "A

landlord of a dwelling unit . . . is guilty of criminal lockout when, without the benefit of a court

order, he deprives a tenant . . . of access to his dwelling unit or his personal possessions." CONN.

---

[3]    In Pearson v. Callahan, 129 S. Ct. 808, 822 (2009), the Supreme Court held that courts
may grant qualified immunity without first resolving, under Saucier's first prong,
whether the defendant's conduct violated the Constitution.

GEN. STAT. § 53a-214(a). Criminal lockout is a class C misdemeanor. The statute criminalizing interfering with an officer states in relevant part: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders, or endangers any peace officer . . . in the performance of such peace officer's . . . duties." CONN. GEN. STAT. § 53a-167a(a). Interfering with an officer is a class A misdemeanor. The purpose of the statute is to ensure civilians' orderly compliance with police officers who are performing their duties. Connecticut v. Hampton, 784 A.2d 444, 456 (Conn. App. 2001).

"Probable cause requires only a "probability or a substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 (1983). Although a probable cause determination must be based on the totality of the evidence at the time of arrest, Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989), "[e]vidence is not required to rise to a significant level of trustworthiness in order to meet the probable cause standard." Connecticut v. Lewis, 717 A.2d 1140, 1156 (Conn. 1998). Moreover, "[i]t is well-settled that police officers have probable cause to arrest if they receive information from a complaining victim or other witness whom they reasonably believe to be telling the truth." Little v. City of New York, 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007); see also Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity.").

The undisputed facts clearly establish that the police had probable cause to believe that Plaintiff violated the criminal lockout statute. On September 27, 2005, Otero spoke with Mathis, the purported victim, who claimed that her landlord had changed the locks, refused her access to her residence, and placed her belongings on the porch outside her residence. Otero saw Mathis'

belongings on the porch of the Beacon Street residence, and thus had independent verification of Mathis' accusations. He spoke with Plaintiff, who acknowledged that Mathis had a lease for June and July but stated that she was now a criminal trespasser. Plaintiff also told Otero that she did not have a court order evicting Mathis from the premises. At this point, based on the totality of the evidence available to him, Otero had probable cause to believe that Mathis was a tenant at the Beacon Street residence, that Plaintiff decided to lockout Mathis after her lease expired, and that she had not obtained a court order evicting Mathis from the premises. Before Otero had even reviewed Mathis' phone bill–which provided additional evidence that she resided at the premises–he could have lawfully arrested Plaintiff for criminal lockout.

In arguing that the officers did not have probable cause to arrest her for criminal lockout, Plaintiff claims that the evidence establishes that Mathis abandoned the premises. This argument has no merit. "Under common law, abandonment is defined as the voluntary and intentional renunciation of a known right and the intent required may be inferred from the surrounding facts." Gnandt v. DeCruz, No. CVBR-9403-02236, 1994 WL 197699, at *2 (Conn. Super. Apr. 27, 1994). The undisputed facts establish that Mathis never evinced an intent to abandon the premises. Although Mathis moved her belongings into a common hallway in early September, she told Plaintiff she could not yet move out and never removed her belongings from the premises. During two conversations with Mathis later on that month, Plaintiff demanded that she move out and Mathis unequivocally responded both times that she would not because she "knew her rights." Contrary to Plaintiffs' arguments, Mathis made clear that she would not relinquish her tenancy.

The undisputed facts likewise establish that the officers had probable cause to arrest

Plaintiff for obstructing and resisting them while they attempted to perform their duties. When the officers arrived at the Beacon Street residence and told Plaintiff that they had proof that Mathis resided there, Plaintiff refused to allow Mathis into the Beacon Street residence. Instead she went inside, shut the door, and refused to speak with the officers for forty minutes. These actions undoubtedly hampered the police from investigating the incident and returning Mathis to her residence.

Plaintiff alternatively argues that the officers' warrantless arrest of her in her home was unlawful regardless of the existence of probable cause.[4] Connecticut General Statute § 54-1f(a) authorizes police officers to arrest an individual without a warrant "when the person is taken or apprehended in the act or on the speedy information of others . . ." However, even if there is probable cause to arrest based on speedy information or apprehension in the act, a warrantless arrest of a suspect in his home is presumptively unconstitutional. Payton v. New York, 445 U.S. 573, 586 (1980). See also Loria v. Gorman, 306 F.3d 1271, 1283 (2d Cir. 2002) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into the home."); Connecticut v. Brosnan, 608 A.2d 49, 52 (Conn. 1992) ("[T]he fourth amendment prohibits the police from making a warrantless and nonconsenual entry into a suspect's home in order to make a routine felony or misdemeanor arrest.").[5]

---

[4]     Defendants argue that the Court should foreclose this argument because Plaintiff failed to plead a claim for illegal entry in her complaint, and thus Defendants did not receive fair notice of this allegation. The Court disagrees with Defendants because paragraph 27 gives adequate notice of a claim for illegal entry. It states: "Under duress, due to the Defendant police officers threatening conduct, the Plaintiff allowed one of the Defendant police officers to enter her home to discuss the situation with her."

[5]     It should be noted that there has been inconsistency among the federal courts as to whether a warrantless arrest in the home may form the basis for a § 1983 false arrest claim where, as here, the police had probable cause to initiate the arrest. In Breitbard v.

The officers argue that Plaintiff consented to their entry into her home, which obviated the need for an arrest warrant. Plaintiff counters that her consent to Officer Kneeland's entry was made under duress. "The government must demonstrate that "consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). Coercion and duress, however, are narrowly construed, as "'the law permits police to pressure and cajole, conceal material facts, and actively mislead'" in seeking consent to enter or to search. Breitbard, 390 F. Supp.2d at 248 (quoting Hadley v. Williams, 368

---

Mitchell, 390 F. Supp. 2d 237, 245-46 (E.D.N.Y. 2005), the court granted summary judgment to the defendant officers on plaintiff's false arrest and malicious prosecution claims even though the officers had initiated a warrantless arrest of the plaintiff in her home. The court held that the fact that the officers had probable cause to initiate the arrest constituted a complete defense to both actions. However, the warrantless arrest was a sufficient basis to deny summary judgment as to the plaintiff's § 1983 claim for unreasonable seizure. Id. at 247. See also Stokes v. City of New York, No. 05-CV-0007 (JFB)(MDG), 2007 WL 1300983 (E.D.N.Y. May 3, 2007) (same). Moreover, as discussed *supra*, courts have repeatedly held that probable cause is a *complete* defense to a false arrest claim, which suggests that a warrantless arrest in the home is not a sufficient basis for sustaining a false arrest claim, although none of these cases dealt with the warrantless arrest of a suspect in his home. See e.g., Weyant, 101 F.3d at 852; Garcia, 193 F. Supp. 2d at 449. Connecticut courts, on the other hand, have defined false arrest claims broadly to encompass any "unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 440 A.2d 973, 974 (Conn. 1983); see also Berry v. Loiseau, 614 A.2d 414, 432 (Conn. 1992) ("To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly.") (internal citation omitted); Rolon v. Murray, No. CV000434590S, 2002 WL 31819065, at *6 (Conn. Super. Ct. Nov. 26, 2005) ("The right to arrest without a warrant is regulated by statute, and an arrest except as authorized is illegal."). Because it is an established rule that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home," Kirk v. Louisiana, 536 U.S. 635, 638 (2002), it naturally follows that an unlawful entry into the home in order to effectuate an arrest would constitute an "unlawful restraint" under Connecticut law. See also Loria, 306 F.3d 1283-87 (denying summary judgment to police officer on false arrest and unconstitutional search and seizure claims because officer entered the plaintiff's home without a warrant and in the absence of exigent circumstances). Therefore, this Court believes that a false arrest claim may be based on a warrantless arrest in the home regardless of the existence of probable cause.

F.3d 747, 749 (7th Cir. 2004)); see also United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) ("Consent to a search has been found despite formal arrest, and such additional aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home, and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld."); United States v. Calvente, 722 F.2d 1019, 1024 (2d Cir. 1983) (holding that consent to enter was not coercive despite federal agents' statements that they would seek a search warrant in the absence of consent and that they desired to avoid an armed confrontation).

In determining whether consent was validly given, "courts examine the totality of the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority," Garcia, 56 F.3d at 422, such as "whether force was used or threatened, whether the person who consented to the search was particularly vulnerable, and whether the search took place at night." Djonbalic v. City of New York, No. 99 CIV. 11398 SHSJP, 2000 WL 1146631, at *10 (S.D.N.Y. Aug. 14, 2000). According to Plaintiff, four officers appeared at her home at approximately 11:00 pm. She initially opened the door to speak with them, but soon unilaterally ended the conversation and shut the door. The officers then proceeded to pound on the door and windows for forty minutes while threatening to arrest Plaintiff and her friend if they did not open the door. Given the number of officers present, the late hour, Plaintiff's refusal to speak with the officers or allow them in her home for over forty minutes, and their threats to arrest her and a friend, this Court concludes that a question of fact exists as to whether Plaintiff's consent was voluntarily given or the product of

coercion and duress. Thus the Court cannot conclude as a matter of law that the officers lawfully

entered her home to effectuate the arrest.[6]

Having found that a question of fact exists as to whether Plaintiff's constitutional rights

were violated, this Court must consider whether the officers are entitled to qualified immunity.

Qualified immunity shields government officials performing discretionary acts from liability if (1)

their conduct did not violate clearly established statutory or constitutional rights, or (2) it was

objectively reasonable for them to believe their acts did not violate those rights. Cerrone v.

Brown, 246 F.3d 194, 199 (2d Cir. 2001).

The first prong of the qualified immunity test–whether the constitutional right at issue is

clearly established–has a clear answer in this case. In United States v. Payton, 445 U.S. 573

(1980), the Supreme Court established a bright-line rule prohibiting a warrantless arrest of a

suspect inside his home absent exigent circumstances or the suspect's consent to enter. "There are

few constitutional rights more clearly established than the right to be free from a search or seizure

in one's own home in the absence of a warrant or in the absence of a well-delineated exception to

the warrant requirement." Sledge v. Stoldt, 480 F. Supp. 2d 530, 535 (D. Conn. 2007). Although

officers may conduct a warrantless arrest of a suspect standing in the threshold of the doorway to

---

[6]     Although exigent circumstances constitute a valid reason for entering a home without a
warrant, Defendants do not argue–and this Court has no reason to believe–that exigent
circumstances existed in this case. "The essential question in determining whether
exigent circumstances justified a warrantless entry is whether law enforcement agents
were confronted by an 'urgent need' to render aid or take action." United States v.
MacDonald, 916 F.2d 766, 769-70 (2d Cir. 1990) (internal citation omitted). The fact
that the crimes for which Plaintiff was arrested were misdemeanors and that the officers
had no reason to believe Plaintiff was armed or dangerous weigh heavily against finding
exigent circumstances. Loria, 306 F.3d at 1285.

his house, see, e.g., United States v. Santana, 437 U.S. 38, 42 (1976); Connecticut v. Santiago, 619 A.2d 1132 (Conn. 1993), Plaintiff was completely inside her home at the time of the arrest. "The Second Circuit has generally found Santana's reasoning inapplicable when the arrestee attempts to stay within in his or her home. . . . It cannot be said as a matter of law that plaintiff abandoned her privacy interest simply by opening the door to her home in response to the defendants' knock." Breitbard, 390 F. Supp. at 248. See also Loria, 306 F.3d at 1286 (holding that officer was not entitled to qualified immunity on plaintiff's Fourth Amendment claims because he prevented the plaintiff from closing his door, took two steps inside, and arrested him without a warrant). The right at issue was clearly established at the time of Plaintiff's arrest.

Under the second prong of the test, the Court must consider whether it was objectively reasonable for the officers to believe that they had Plaintiff's consent to enter her home. According to Plaintiff, four officers showed up at her house at approximately 11:00 pm and she refused to speak them and shut her door. They proceeded to bang on her door and windows for approximately forty minutes and threaten to arrest her and her friend if she did not open the door. She finally relented to the officers' demands and agreed to allow Officer Kneeland into her home. Based on these allegations, it would not be objectively reasonable for the officers to have believed that Plaintiff's "consent was a product of [her] free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Garcia, 56 F.3d at 422. See also Sledge, 480 F. Supp. at 535 (holding that officers were not entitled to qualified immunity on Fourth Amendment claim because a question of fact existed as to whether the officers had a resident's consent to enter). Therefore, the officers are not entitled to qualified immunity and summary judgment is **denied**.

### B. Count Three - Malicious Prosecution

To prove a malicious prosecution claim by Connecticut state officials under § 1983, a plaintiff must establish the elements of malicious prosecution under Connecticut law and the deprivation of a Fourth Amendment right. Rogers v. Apicella, 606 F. Supp. 2d 272, 291 (D. Conn. 2009). The elements of a malicious prosecution claim in Connecticut are: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff, (2) the criminal proceedings terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." Bhatia v. Debek, 948 A.2d 1009 (Conn. 2008) (quoting McHale v. W.B.S. Corp., 446 A.2d 815 (Conn. 1982)). Like a false arrest claim, the existence of probable cause is a complete defense to a malicious prosecution claim. Zalaski v. City of Hartford, 2010 WL 1331422, No. 3:08-cv-601 (VLB), at *10 (D. Conn. Mar. 31, 2010). It remains unclear, however, whether a warrantless arrest in the home with probable cause may also form the basis for a malicious prosecution claim.

Here, the Court need not decide that question because the undisputed facts establish that the officers did not act with malice when arresting Plaintiff. As discussed *supra*, by the time the officers had knocked on Plaintiffs' door on the night of September 27, 2005, they had an abundance of evidence indicating that Plaintiff had criminally locked out her tenant. Although they had probable cause to arrested her immediately, the officers attempted to reason with Plaintiff so that they could resolve the dispute without initiating criminal proceedings against her. The undisputed facts suggest that the officers considered an arrest to be a last resort option, which

was to be used only if and when Plaintiff repeatedly resisted their pleas to comply with the law. Thus, contrary to Plaintiff's assertions, the officers acted solely for the purpose of persuading a criminal offender to abide by the law. Therefore, Defendants' motion for summary judgment as to the malicious prosecution claim is **granted**.

## C. Count Two - Excessive Force

Plaintiff claims that Otero used excessive force when arresting her. Excessive force claims are subject to the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). "Police officers' application of force is excessive . . . if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation." Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (internal citations and quotations omitted). The objective reasonableness standard "requires a careful balancing of the nature and quality of intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. See also Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) ("Whether the force used in connection with the arrest is reasonable depends on a careful weighing of the facts of each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue."). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal quotations and citations omitted).

According to Plaintiff, when Otero attempted to handcuff her, he grabbed her arms so forcefully that she sustained black and blue bruises on her arms. Given that Plaintiff had repeatedly resisted or ignored police requests prior to her arrest, it was reasonable for Otero to believe that she would resist arrest as well, and that a minimal amount of force was necessary to gain control of her to effectuate the arrest. In fact, because "an arrest is by nature an act involving some degree of dominion, and hence force," <u>Yang Feng Zhao v. City of New York</u>, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009), one would expect officers to exert a minimum amount of force–such as grabbing an arrestee's arms–against any non-passive arrestee. Moreover, although long-lasting or severe injuries are not necessary to prevail on an excessive force claim, minor injuries, such as those sustained by Plaintiff, also indicate that the amount of force used was not excessive. <u>See</u> <u>id.</u>("The extent and nature of the injury, if any, . . . is probative of the amount and type of force actually used by the arresting officers, and that in turn is likely to reflect on the reasonableness of that force."). When analyzed in a light most favorable to Plaintiff, the facts nevertheless establish that Otero's use of force was reasonable as a matter of law. Summary judgment on the excessive force claim is **granted**.

**2. Count Four - Violation of Rights Under Article 1 §§ 7, 9 of the Connecticut Constitution**

Plaintiff also asserts claims for unlawful search and seizure and false arrest under the Connecticut Constitution. In <u>Binette v. Sabo</u>, 710 A.2d 688 (Conn. 1988), the Connecticut Supreme Court recognized a private right of action for money damages stemming from violations of Article I §§ 7, 9 of the Connecticut Constitution, which prohibit unreasonable searches and seizures and

unlawful arrests or detentions.[7]  In <u>Binette</u>, the plaintiffs, Joseph and Janet Binette, claimed that a

police chief and a police officer entered their home without a warrant or their permission, pushed Mrs.

Binette, which caused her to fall over a table and against a wall, repeatedly slammed Mr. Binette's

head against a car, and struck Mr. Binette in the head while he was lying on the ground experiencing

an epileptic seizure.  In recognizing the existence of a cause of action for money damages, the court

was influenced by the officers' egregious misconduct.  <u>Id.</u> at 701, n.23.

Since <u>Binette</u>, Connecticut courts have limited private rights of action for Article 1 §§ 7, 9

violations to circumstances involving egregious violations.  In <u>Martin v. Brady</u>, 780 A.2d 961 (Conn.

App. 2001), the plaintiff alleged that, on various occasions, state officers entered his home without

a valid search warrant, pushed him to the ground, and smashed the windows and doors of his house.

After holding that sovereign immunity provided a complete defense to the claims, the court also found

that these allegations did not rise to level of egregious conduct necessary to maintain an action under

<u>Binette</u>.  <u>Id.</u> at 967.  Similarly, in <u>Faulks, Jr. v. City of Hartford</u>, No. 3:08-cv-270 (VLB), 2010 WL

259077, at *10 (D. Conn. Jan. 19, 2010), the court granted summary judgment to the defendant

officers on the plaintiff's state constitutional claims because the conduct of the officers, who struck

the plaintiff with a baton while he was resisting arrest, "involve[d] no physical confrontation akin to

the level of force at issue in <u>Binette</u>."  <u>See also</u> <u>ATC Partnership v. Town of Windham</u>, 741 A.2d 305,

314 (Conn. 1999) (noting that the court in <u>Binette</u>, "recognized the validity of . . . a state

---

[7]    Article I, § 7 states: "The people shall be secure in their persons, houses, papers and
possessions from unreasonable searches or seizures; and no warrant to search any place,
or to seize any person or things, shall issue without describing them as nearly as may be,
nor without probable cause supported by oath or affirmation."  Article I, § 9 states: "No
person shall be arrested, detained or punished, except in cases clearly warranted by law."

constitutional claim . . .  in the context of allegations of an egregiously unreasonable search and seizure").

The facts alleged here are far less egregious than even those alleged in <u>Martin</u> and <u>Faulks</u>.  In fact, as discussed *supra*, the officers had probable cause to arrest Plaintiff and used a reasonable amount of force when doing so.  The only remaining question is whether they had consent to enter her home.  Even if their entry were illegal, however, that fact does not rise to level of egregiousness necessary to sustain a claim under the Connecticut Constitution.  Summary judgment is **granted**.

**3. Count Five - Liability for Reckless and Negligent Conduct**

Plaintiff also asserts claims of common law recklessness and negligence against the officers. The Court will address the recklessness claim first.

"Recklessness is a state of consciousness with reference to the consequences of one's acts. . . .  It is more than negligence, more than gross negligence. . . .  [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . .  It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the actions." <u>Craig v. Driscoll</u>, 813 A.2d 1003, 1022 (Conn. 2003) (internal citation omitted).  "[W]illful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." <u>Id</u>.(internal citation omitted).

Construing the facts in the light most favorable to Plaintiff, the officers' actions did not

constitute an extreme departure from the standard of ordinary care or a reckless disregard for Plaintiffs' safety in a situation where a high degree of danger was apparent. As discussed *supra*, the officers had probable cause to arrest Plaintiff and used a reasonable amount of force in doing so. At no time did the officers jeopardize Plaintiff's health or safety or otherwise create an unreasonable risk of harm to her. Summary judgment is **granted** as to Plaintiff's recklessness claim.

Plaintiff alternatively argues that the officers acted negligently. Although negligence is an easier standard to meet than recklessness, Connecticut law limits the liability of municipalities for negligent acts committed by their employees. Connecticut General Statute § 52-557n(a)(2)(B) states in relevant part: "[A] political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." The Connecticut Supreme Court has held that the acts or omissions of a police department–such as the failure to provide adequate police protection to civilians–are discretionary decisions that do not give rise to municipal liability. Gordon v. Bridgeport Housing Auth., 544 A.2d 1185, 1195-96 (Conn. 1988). Furthermore, Connecticut courts have consistently held that the investigation of crimes and the decision to arrest are also discretionary functions that immunize police officers from liability. Thomas v. Tuyen Duong, No. CV055001223S, 2008 WL 901442, at *14 (Conn. Super. Mar. 12, 2008) (collecting cases). Immunity for discretionary acts applies to lawsuits against municipal police officers in both their individual and official capacities. Tyson v. Willauer, 290 F. Supp. 2d 278, 287 (D. Conn. 2003).

Plaintiff, however, argues that the circumstances of this case fall within one of the exceptions to the discretionary act immunity doctrine. "[L]iability [against a municipal employee] may be imposed when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . ." Violano v. Fernandez, 907 A.2d 1188, 1194 (Conn. 2006) (internal citation omitted). This exception only applies if the "officer's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity-to encourage municipal officers to exercise judgment-has no force." Id (internal citations omitted). Plaintiff asserts that the officers who accompanied Otero to her residence should have intervened to prevent Otero from arresting her because it was apparent that "to arrest her would require imminent harm to her civil rights . . ." (Pl.'s Mem. at 30.) This argument is without merit. The undisputed facts make clear that at no time prior to or during her arrest was Plaintiff at risk of imminent physical or mental harm, and thus the officers had no duty to prevent her arrest. Therefore, the officers are entitled to immunity for their allegedly negligent acts, and summary judgment is **granted** as to Plaintiff's negligence claim.

### 4. Count Six - Assault and Battery

Plaintiff also asserts an assault and battery claim against the officers. To prevail on the claim, Plaintiff must show that the officers applied force on her and that the application of such force was unlawful. Betancourt v. Slain, 676 F. Supp. 2d 71, 80 (D. Conn. 2009). Because the Court has found that the officers' use of force was reasonable as a matter of law, Plaintiffs' assault and battery claim fails. See Miller v. Lovett, 879 F.2d 1066, 1073 (2d Cir. 1989), abrogated on other grounds by Graham, 490 U.S. 386 (1989) (noting that a constitutional claim of excessive force is "tightly

interwoven" with a state claim for assault and battery such that "a decision on the former will collaterally estop litigation of the latter"). Summary judgment is **granted**.

## 5. Count Seven - Negligent Infliction of Emotional Distress

Plaintiff also asserts a negligent infliction of emotional distress claim against the officers. However, as discussed in Section III(B)(3) *supra*, the officers are immunized from liability for their negligent acts. Therefore, summary judgment is **granted**.

## 6. Count Eight - Intentional Infliction of Emotional Distress

Plaintiff also seeks damages for intentional infliction of emotional distress. "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. . . . Liability has been found only where the conduct has been so outrageous in character, and do extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Appleton v. Board of Ed. of Town of Stonington, 757 A.2d 1059, 1062 (Conn. 2000) (internal citations and quotation omitted). "Whether an actor's conduct is 'extreme and outrageous' is an issue for the Court in the first instance and a factual question for the jury '[o]nly where reasonable minds disagree' as to whether 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . .'" Rogers v. Apicella, 606 F. Supp. 2d 272, 293 (D. Conn. 2009) (quoting Appleton, 757 A.2d at 1062). Conduct that is merely insulting, displays bad manners or results in hurt feelings is insufficient to form the basis for an intentional infliction of emotional distress claim. Carrol v. Allstate Ins. Co., 815 A.2d 119, 126 (Conn. 2003).

Plaintiff does not come close to meeting the standard for an intentional infliction of emotional distress claim.  As discussed *supra*, not only was the officers' decision to investigate and arrest Plaintiff not outrageous or atrocious, but it was entirely reasonable given the ample evidence that Plaintiff had committed the crime of criminal lockout.   Even if some of their conduct–such as banging on Plaintiff's door and windows and threatening to arrest her and a friend if they did not come to the door–was coercive, it was by no means extreme and atrocious as it is clear that their motive was to persuade Plaintiff to abide by the law.  Summary judgment is **granted**.

**7. Count Nine - False Imprisonment**

False imprisonment is "the unlawful restraint by one person of the physical liberty of another." Green v. Donroe, 440 A.2d 973 (Conn. 1982).  See, e.g., Zanks v. Fluckiger, 171 A.2d 86 (Conn. Super. 1961) (holding that, because constable was not authorized to make arrests outside his precinct, the arrest of plaintiff was illegal and grounds for a false imprisonment action).  Although the officers had probable cause to arrest Plaintiff, a question of fact exists as to whether they lawfully entered her home to effectuate the arrest.   Therefore, summary judgment as to this claim is **denied**.

**8. Count Ten - Malicious Prosecution**

Because a  malicious prosecution claim under 42 U.S.C. § 1983 is identical to a malicious prosecution claim under Connecticut law, this claim fails for the reasons discussed in Section III(B)(1)(B), *supra*.  Summary judgment is **granted**.

**C. Claims Against Chief of Police Hartnett and/or the City of Hartford**

**1. Count Eleven - 42 U.S.C. § 1983 Claim Regarding Polices, Practices and Customs**

As against the City of Hartford and Chief of Police Hartnett, Plaintiff asserts that the city had in effect *de facto* policies, procedures and customs that exhibited deliberate indifference to the safety and lives of the residents of Hartford and that caused the unconstitutional conduct engaged in by the officers. Her complaint alleges that the police department failed to train its officers in making arrests based on probable cause, failed to supervise and discipline officers who engage in unlawful arrests, and instilled "a police code of silence wherein police officers regularly cover up police unlawful conduct . . ." (Compl. ¶ 43.)

In order to hold a municipality liable for the conduct of its employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy. Ricciuti v. New York City Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991). A plaintiff must prove "both the existence of a municipal policy or custom and a causal connection between that policy or custom and the deprivation of his constitutional rights . . ." Dodd v. City of Norwich, 827 F.2d 1, 5 (2d Cir. 1987). The policy must be "the moving force of the constitutional violation." Id. (quoting Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978)). A plaintiff asserting a "failure to train" or "failure to supervise" theory of liability must establish "not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that th[e] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty Am .v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989)).

Plaintiff's primary argument is that the police department inadequately trains its officers in

the handling of landlord/tenant disputes, and that the inadequate training caused the officers to arrest her for criminal lockout despite an absence of probable cause. However, because this Court has concluded that the officers had probable cause to arrest Plaintiff for the misdemeanor crimes of criminal lockout and interfering with an officer's duties, Plaintiff has failed to show a violation of her constitutional rights stemming from inadequate training in landlord/tenant disputes.

Plaintiff also argues that the police department has inadequately trained its officers in the procedures for making a lawful arrest of a suspect inside his home. As evidence of inadequate training in this subject matter, Plaintiff relies on an short excerpt from Otero's deposition. He was asked: "Do you need a warrant to enter someone's house to arrest them?" He answered: "Not necessarily." (Otero Dep. at 47.) As Plaintiff acknowledges, an officer may conduct a warrantless arrest of a suspect in his home if the officer receives consent to enter or if exigent circumstances exist. Thus Otero's response that a warrant is not necessarily required is entirely accurate. And, as Otero explained later in his deposition, he believed "we did have consent [to enter Plaintiff's home] because she allowed Officer Kneeland in." (Id. at 48-49.) Contrary to Plaintiff's claim, Otero's deposition answers suggest that he is familiar with the constitutional limitations on arrests in the home.

Plaintiff also asserts that the findings from the internal investigation of the incident culminating in her arrest are evidence of inadequate training and supervision with regard to arrests in the home. According to Plaintiff, the Internal Affairs Board cleared Otero of misconduct on the grounds that he had probable cause to arrest her but should have reprimanded him for conducting the arrest without a warrant. This failure, Plaintiff argues, is evidence that the city has a policy of encouraging its officers to arrest people in their homes without warrants. Because Plaintiff has not

included any documentation of the internal investigation findings with her summary judgment papers or provided any evidence indicating that the internal investigation was inadequate, the Court has no basis for determining whether Otero should have been reprimanded or whether the findings were otherwise flawed. Rather, the Court can only surmise that the Internal Affairs Board believed that Otero obtained Plaintiff's consent to enter and therefore concluded that he did not need a warrant to arrest her. More importantly, it cannot be said that the city's failure to reprimand Otero for his warrantless arrest of Plaintiff *caused* the alleged constitutional violation at issue unless Plaintiff provides some evidence of a custom or policy in place before the incident occurred, which she has failed to do.

Plaintiff has failed to provide any evidence–other than her warrantless arrest–of a policy or custom that caused the allegedly unconstitutional conduct. "The mere fact that [a plaintiff] was falsely arrested, without more, does not more show that the City's training program is inadequate. A training program is not inadequate merely because a few of its graduates deviate from what they were taught." Jenkins v. City of New York, 478 F.3d 76, 95 (2d Cir. 2007); see also Amnesty Am., 361 F.3d at 130-31 (affirming grant of summary judgment to town because plaintiffs' "failure to train" theory was based solely on police officers' excessive use of force on two occasions and plaintiffs "proffered no evidence of the Town's training programs or advanced any theory as to how a training deficiency caused the police officers to use excessive force"). Therefore, summary judgment is **granted**.

**2. Count Twelve - Connecticut Constitution Claim Regarding Policies, Practices and Customs**

Plaintiff also argues that the City of Hartford's *de facto* policies, procedures and customs

violated Article 1, §§ 7 and 9 of the State of Connecticut Constitution.  Because Plaintiff has failed to provide any evidence of a policy or custom that caused a violation of her constitutional rights, summary judgment is **granted**.

### 3. Count Thirteen - Respondeat Superior Liability under Conn. Gen. Stat. § 52-557n

 Plaintiff seeks to hold the City of Hartford liable for the negligent acts or omissions of the officers pursuant to Conn. Gen. Stat. § 52-557n because the officers' acts "placed the Plaintiff, an identifiable victim of the Defendant police officers' negligence, in imminent harm." (Compl. ¶ 45.) As discussed in Section III(E) *supra*, Conn. Gen. Stat. § 52-557n immunizes a political subdivision of a state from the "negligent acts or omissions [of its employees] which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Although an exception exists if an employee's failure to act places an identifiable victim in imminent harm, Plaintiff was never at risk of imminent harm during the officers' investigation and arrest. Therefore, the City if Hartford cannot be held liable for the negligent acts of its employees, and summary judgment is **granted**.

### 4. Count Fourteen - Indemnification Pursuant to Conn. Gen. Stat. § 7-465

 Plaintiff also seeks to hold the City of Hartford legally liable for all sums that the officers may become obligated to pay pursuant to Conn. Gen. Stat. § 7-465.  The statute provides in relevant part:

> Any town, city, or borough . . . shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded or infringement of any person's civil rights or for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, or physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, or physical

injury or damage was not the result of any willful or wanton act of such employee
in the discharge of such duty. . . .  Governmental immunity shall not be a defense in
any action brought under this section.

"Section 7-465 is an indemnity statute; it does not create liability.  Under Section 7-465, the

municipality's duty to indemnify attaches only when the employee is found liable and the employee's

actions do not fall within the exception for willful and wanton acts."  Myers v. City of Hartford, 853

A.2d 621 (Conn. 2004).  If Plaintiff is successful on her false arrest and false imprisonment claims,

the City of Hartford may be liable for indemnification.  Therefore, summary judgment is **denied** as

to this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike is **granted** [Doc. No. 82], Plaintiff's

Motion for Summary Judgment is **denied** [Doc No. 80], and Defendants' Motions for Summary

Judgment [Doc. Nos. 71, 73] are **granted in part and denied in part**.  Summary judgment is granted

as to all claims against Officer Perez and he is dismissed from this action.  Summary judgment is

denied as to Plaintiff's false arrest claim pursuant to 42 U.S.C. § 1983 (Count One), the false

imprisonment claim under the common law of Connecticut (Count Nine), and the indemnification

claim under Connecticut law (Count Fourteen).  Defendants' summary judgment motions are granted

as to all other claims.

SO ORDERED.
Dated at New Haven, Connecticut, this  29th  day of October, 2010.


                                        /s/
                              _____

                              Peter  C. Dorsey, U.S. District Judge
                              United States District Court